UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIC ERNST, | ) | CIVIL ACTION NO. 4:21-CV-1702 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| UNION COUNTY CONSERVATION | ) | |
| DISTRICT *et al.*, | ) | |
| Defendants | ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Eric Ernst ("Plaintiff") filed this action against his employers, Union County and the Union County Conservation District ("Defendants"), alleging violations of the Age Discrimination in Employment Act, the Pennsylvania Human Relations Act, and the Pennsylvania Whistleblower Law. The parties have consented to proceed before a United States Magistrate Judge. (Doc. 21). Currently before the Court is Defendants' Motion for Summary Judgment. (Doc. 43). For the reasons explained in this Memorandum Opinion, Defendants' Motion for Summary Judgment will be granted in part and denied in part.

## II.    BACKGROUND AND PROCEDURAL HISTORY

### A.    UNION COUNTY AND THE UNION COUNTY CONSERVATION DISTRICT

A Memorandum of Understanding between Union County and Union County Conservation District ("UCCD") provides that personnel matters involving UCCD employees "shall be managed in consultation with the Board of Commissioners and

as prescribed by the County Personnel Policy and procedures established by the County." (Doc. 44-4, p. 3; Doc. 52-1, p. 368; Doc. 44, ¶ 9; Doc. 50, ¶ 9). The Commissioners possess the ultimate authority to decide whether to discharge an employee. (Doc. 44, ¶ 30; Doc. 50, ¶ 30).

County Policy 716 – Disciplinary Action provides that "where appropriate, it is the policy of the County to utilize progressive discipline." (Doc. 44-5, p. 2; Doc. 52-1, p. 361). The policy also provides that "disciplinary action may include an oral warning, written reprimand, suspension or discharge, depending on the severity of the misconduct." (Doc. 44-5, p. 2; Doc. 52-1, p. 361). The policy states that "[d]isciplinary action or dismissal may result from work-related offenses" including "2. Insubordination, including deliberate refusal to comply with work assignments or instructions," and "8. Any conduct which reflects unfavorably on the County, indecent conduct, including use of abusive, obscene or threatening language or physical acts." (Doc. 44-5, p. 2; Doc. 52-1, p. 361).

In an email from Sonia Showers, the Union County and UCCD HR Director, to then Conservation District Manager Eric Nyerges, the discipline process was explained as typically being a progressive process. (Doc. 52-1, p. 363). The email stated, "[t]ermination is used as the final result of moving through well-documented steps of the progressive discipline process or in the case of an extremely serious first offense such as criminal activity or violence on the job. The County does not

discharge any employee without just cause." (Doc. 52-1, pp. 363-364). The email

outlined the procedures for termination:

> Department Heads must have approval from the Board of
> Commissioners to terminate an employee. The Department Head will
> be required to prove just cause at an Executive Session with the
> Commissioners. The only exception is in the case of an extremely
> serious offense such as criminal activity or violence on the job that
> would require an immediate termination of the employee.

(Doc. 52-1, p. 364).

### B.    PLAINTIFF'S EMPLOYMENT AT UNION COUNTY

In December 1989, Plaintiff began working as a maintenance worker for

Union County, and in 1994 was transferred to work at UCCD as an Erosion and

Sedimentation ("E&S") Pollution Control Technician. (Doc. 27, ¶¶ 14, 15, 41; Doc.

48, ¶¶ 14, 15, 41). In this role Plaintiff was responsible for administering the E&S

Control Program and the National Pollutant Discharge Elimination System

("NPDES") Program as delegated to UCCD by the Pennsylvania Department of

Environmental Protection ("PADEP"). (Doc. 51, ¶ 13). Plaintiff alleges in his

Amended Complaint that from December 1994 to January 2019, Plaintiff had no

job-related issues with Defendants, and in his Counterstatement of Material Facts

that, except for a 2012 incident between him and another employee, he had no

documented performance issues for three decades. (Doc. 27, ¶ 16; Doc. 51, ¶ 36).

Defendants dispute this, asserting that although Plaintiff had no formally

documented job-related issues, his behavior during his employment was an issue "in

that he presented with a negative attitude and he frequently complained about his compensation." (Doc. 48, ¶ 16).

### C.    HIRING OF ERIC NYERGES

In or around January 2019, Eric Nyerges was hired as the Conservation District Manager. (Doc. 27, ¶ 17; Doc. 48, ¶ 17). Nyerges was therefore Plaintiff's supervisor. (Doc. 27, ¶ 17; Doc. 48, ¶ 17). Plaintiff alleges that soon after Nyerges started, he began asking Plaintiff about Plaintiff's plans for retirement, and continued to do so while Plaintiff worked at UCCD. (Doc. 51, ¶ 39). Plaintiff alleges Nyerges made comments about him retiring to Plaintiff, his co-workers, and individuals outside UCCD, despite Plaintiff never expressing plans to retire. (Doc. 51, ¶¶ 41-48). Defendants do not agree. (Doc, 45, pp. 14-15).

### D.    PLAINTIFF REPORTS IMPROPERLY PROCESSED NPDES PERMITS

In early 2021, Plaintiff became aware of problems with NPDES permits processed by former UCCD coworker Greg Bonsall. (Doc. 51, ¶ 49). Plaintiff alleges that in one instance, a permit approval letter was issued without an actual permit, that Bonsall had failed to sign off on certain modules as required when processing permits, that certain NPDES permits were not published in the Pennsylvania Bulletin as required, and that Nyerges was not signing approval letters as required. (Doc. 51, ¶¶ 50-53).

Plaintiff alleges that on March 11, 2021, he met with Nyerges to discuss his workload, but the two ended up discussing the improperly processed NPDES permits. (Doc. 51, ¶ 57). Plaintiff alleges Nyerges responded by indicating that he wanted to retaliate against Bonsall by reporting him to PADEP. (Doc. 51, ¶ 60). Plaintiff then informed Nyerges that he was the one negligent by not signing the permits. (Doc. 51, ¶ 61).

Plaintiff also alleges he reported the improperly processed permits to several other individuals. The timeline of when Plaintiff made his reports is unclear. It appears, however, that Plaintiff spoke with all of these individuals around the time of his meeting with Nyerges regarding the permits, in March 2021. Plaintiff testified that during the March 11, 2021 meeting, he stated that he would advise the Vice Chair of the UCCD Board, Lucas Criswell, about the improperly reported permits. (Doc. 45-4, p. 8, N.T. 28:10-15). Plaintiff also testified that his communications with PADEP and Criswell were subsequent to the March 11, 2021 meeting with Nyerges. (Doc. 45-4, p. 46, N.T. 179:11-18; Doc. 51, ¶ 62). However, Plaintiff then testified that a few days before the March 11, 2021 meeting with Nyerges he met with Criswell and informed him of the improperly processed permits. (Doc. 45-4, p. 32, N.T. 121:4-10, p. 58, N.T. 225:13-19). Plaintiff also testified that he could not recall the date he spoke with Criswell about the permits. (Doc. 45-4, p. 12, N.T. 42:10-17).

Plaintiff alleges he informed Curtis Barrick, a PADEP engineer, of the improperly processed permits. (Doc. 51, ¶ 63). Plaintiff was unable to recall when he informed Barrick of the improperly processed permits. (Doc. 45-4, p. 12, N.T. 44:18-22; Doc. 51, ¶ 63). Plaintiff also alleges he spoke with another PADEP engineer, James Cassidy, about the improperly processed permits, but when deposed could not recall when he did so. (Doc. 51, ¶ 64; Doc. 45-4, p. 13, N.T. 47:14-21, p. 21, N.T. 77:3-5). Plaintiff alleges he also spoke with Charlie Axman, a private consultant engineer, about the improperly processed permits. (Doc. 51, ¶ 56; Doc. 45-4, p. 24, N.T. 92:3-13).

### E.    THE MARCH 30, 2021 ALTERCATION

On March 30, 2021, Plaintiff and Nyerges got into an altercation, stemming from an e-mail Nyerges sent. The parties dispute much about the incident, most notably the descriptions and characterizations of Plaintiff and Nyerges's behavior.

Plaintiff testified that on March 30, 2021, he attended a staff meeting at which he mentioned he was going to a preconstruction meeting with Vernon Martin and was going to check on the Rusty Rail site. (Doc 44-8, p. 9; Doc. 52-1, p. 344; Doc. 45-4, p. 49, N.T. 192:15-23). At some point, Plaintiff created a Google calendar entry for March 30, 2021, that read, "eric e preconstruction meeting v martins, Rusty Rail." (Doc. 44-9, p. 2; Doc. 44, ¶ 14, Doc. 50, ¶ 14). While Plaintiff was out, Nyerges sent an email to the planning department and Plaintiff indicating that

Plaintiff had a preconstruction meeting with the Rusty Rail that morning and that more information would be available once Plaintiff returned. (Doc. 44, ¶ 12; Doc. 51, ¶ 77).

After returning from the preconstruction meeting and checking on the Rusty Rail, Plaintiff checked his email. (Doc. 51, ¶ 78). Plaintiff read the email Nyerges sent. (Doc. 51, ¶ 78). Confused as to why Nyerges had sent the email, Plaintiff went to Nyerges's office, standing in the doorway. (Doc. 44, ¶¶ 12, 13, 15, Doc. 51, ¶¶ 79, 80). Plaintiff alleges that he again informed Nyerges that he did not have a preconstruction meeting for the Rusty Rail and expressed his confusion about the email. (Doc. 51, ¶ 80). Plaintiff alleges that Nyerges then threw his pen on his desk and used a "raised, gruff tone," while telling Plaintiff they needed to talk. (Doc. 51, ¶ 81). Plaintiff alleges he told Nyerges he was uninterested in speaking about the issue further at the time and returned to his office. (Doc. 51, ¶ 82). Defendants allege that Plaintiff initiated the confrontation by approaching Nyerges in his office and demanding to know why he sent the email. (Doc. 44, ¶¶ 12,13). Defendants allege that after Plaintiff came to Nyerges's office, Nyerges requested he clarify his issue with the email, but Plaintiff said he was not interested in speaking with Nyerges and abruptly left. (Doc. 44, ¶¶ 12, 13 16).

Plaintiff alleges that he went to his office, left a voicemail, and then exited his office to head towards the Map Room. (Doc. 51, ¶ 83). Plaintiff alleges that Nyerges

was standing outside a neighboring cubical and again "demanded" Plaintiff speak with him in a "very loud, very demanding tone," while appearing "visibly agitated" and red in the face. (Doc. 51, ¶¶ 84-85). Plaintiff alleges he continued walking towards the Map Room while telling Nyerges that he did not want to meet and did not want to meet alone with Nyerges. (Doc. 51, ¶ 86). Plaintiff alleges Nyerges followed him to the Map Room, resulting in him asking Nyerges to stop following him, to which Nyerges responded "we are going to the Map Room." (Doc. 51, ¶¶ 89-90). Plaintiff alleges he again asked Nyerges to stop following him and stated he would not meet with Nyerges at the time and did not want to meet with him alone, but Nyerges did not stop and continued to demand Plaintiff meet with him. (Doc. 51, ¶¶ 91-92). Plaintiff then stated, "I'm not fucking going anywhere with you." (Doc. 51, ¶ 93). Plaintiff alleges Nyerges told Plaintiff he was going to write Plaintiff up for swearing and insubordination, disengaged from the conversation, and left to go complete the write-up. (Doc. 51, ¶¶ 94, 97). Defendants allege that Nyerges made several attempts to meet with Plaintiff, including at one point in the Map Room, but Plaintiff rebuffed Nyerges's attempts and later said to Nyerges that he was not "fucking going anywhere with [him]." (Doc. 44, ¶ 17). Defendants allege that, because of Plaintiff's behavior, Nyerges went back to his office to draft a disciplinary notice to Plaintiff. (Doc. 44, ¶ 18).

Plaintiff alleges that after Nyerges went back to his office, he approached Cynthia Moyer,[1] who had heard the conversation, and asked her if she remembered him saying he was going to the Rusty Rail for a site visit at the staff meeting. (Doc. 51, ¶ 98). Plaintiff and Defendants agree that when Nyerges left his office he saw Plaintiff speaking with Moyer about what had occurred between he and Plaintiff. (Doc. 44, ¶ 19; Doc. 50, ¶ 19; Doc. 51, ¶ 99). Nyerges then told Plaintiff to go home, but Plaintiff refused. (Doc. 44, ¶¶ 20, 21; Doc. 51, ¶¶ 100, 101). Plaintiff alleges he refused to leave and indicated to Nyerges that he already planned to leave in thirty minutes to go to a doctor's appointment and would leave at that time. (Doc. 51, ¶ 101).

Plaintiff alleges that Nyerges then told him again to go home, at which point he disengaged and walked to his office. (Doc. 51, ¶ 102). Plaintiff alleges that Nyerges followed him and ultimately blocked Plaintiff from being able to leave his office. (Doc. 51, ¶ 103). Plaintiff alleges he asked Nyerges to move several times, but Nyerges refused while having "a smug look on his face and smiling." (Doc. 51, ¶ 105). Defendants allege that Plaintiff and Nyerges came into close physical proximity while standing in the hallway outside of Plaintiff's office. (Doc. 44, ¶ 22).

---

[1] At the time of the March 30, 2021 incident, Cynthia used the last name Kahley. At the time of her deposition, her last name had changed to Moyer. (Doc. 45-11, p. 5, N.T. 4:16-19). The Court will refer to her by her current last name, Moyer.

Plaintiff and Defendants agree that during this interaction, Plaintiff called Nyerges a "fucking pussy." (Doc. 44, ¶ 24; Doc. 51, ¶ 107).

Plaintiff alleges Nyerges then told him, "go ahead and push me and see what happens," to which Plaintiff responded, "no, you go ahead and push me first." (Doc. 51, ¶¶ 108, 112). Plaintiff alleges that Nyerges told Plaintiff that Plaintiff threatened him and he was going to call the police. (Doc. 51, ¶ 113). Plaintiff alleges that around this time, he indicated that he would leave if Showers told him to leave. (Doc. 51, ¶ 116). Plaintiff alleges Nyerges then left to find Showers, entering her office and demanding she tell Plaintiff to leave or he would call the police. (Doc. 51, ¶¶ 120, 121, 122). Plaintiff alleges Showers then approached Plaintiff who began to explain what had happened. (Doc. 51, ¶ 124). Plaintiff alleges Showers told Plaintiff he could explain later and directed him to leave. *Id*. Plaintiff alleges he then retrieved his personal cellphone and left the building. (Doc. 51, ¶ 126). Defendants allege that Plaintiff told Nyerges he would leave if directed by Showers. (Doc. 44, ¶ 23). Defendants allege that Plaintiff and Nyerges both remarked for the other to push them, leading Nyerges to tell Plaintiff he was going to contact the police and notify HR, to which Plaintiff said "go ahead and call the police." (Doc. 44, ¶¶ 25, 26). Defendants allege that Nyerges then left to get Showers, and Plaintiff was ultimately escorted from the premises by her. (Doc. 44, ¶¶ 27, 28).

### F.    PLAINTIFF'S TERMINATION

Immediately following the altercation, Nyerges and Showers went into the office of the Chief Clerk Administrator for Union County, Susan Greene, to discuss the incident. (Doc. 51, ¶ 127; Doc. 45-5, p. 19, N.T. 71:7-10; Doc. 44-8, p. 12; Doc. 52-1, p. 348). At the time, Greene was in a Zoom meeting with the County Commissioners, Preston R. Boop, Jeffrey P. Reber, and Stacy A. Richards. (Doc. 51, ¶ 128; Doc. 45-7, p. 48, N.T. 47:8-9; Doc. 52-1, p. 291, N.T. 47:8-9). Nyerges then informed the Commissioners of the altercation and told them his version of events. (Doc. 51, ¶ 131; Doc. 45-7, p. 49, N.T. 48:2-3; Doc. 52-1, p. 292, 48:2-3).

After the Zoom meeting, Greene and Showers conducted an investigation into the altercation. (Doc. 45-7, pp. 47-48, N.T. 46:24-47:5, pp. 49-50, N.T. 48:25-49:5; Doc. 52-1, pp. 290-291, N.T. 46:24-47:5, pp. 328-239, N.T. 48:25-49:5). Showers requested written statements from those who witnessed the event, including Plaintiff, Nyerges, Moyer, Patrick Cullen, and Randall Ross, and wrote her own statement. (Doc. 44, ¶ 29; Doc. 51, ¶ 137; Doc. 44-8, pp. 1-13; Doc. 45-7, p. 50, N.T. 49:10-11; Doc. 52-1, p. 293, N.T. 49:10-11, pp. 344-353). Showers and Greene then discussed the statements and their findings, and ultimately concluded that they "felt like a lot of this could have been avoided if Eric Ernst would have just met and discussed the situation with Eric Nyerges from the beginning." (Doc. 51, ¶ 146; Doc. 45-7, p. 79, N.T. 78:1-5; Doc. 52-1, p. 319, N.T. 78:1-5).

On approximately April 4, 2021, an executive session with the Commissioners, Greene and Showers was held. (Doc. 51, ¶ 147; Doc. 45-7, p. 78, N.T. 77:1-10; Doc. 45-9, p. 88, N.T. 87:6-9; Doc. 52-1, p. 318, N.T. 77:1-10). At that executive session, Showers and Greene shared their conclusion with the Commissioners. (Doc. 51, ¶ 147; Doc. 45-7, p. 84, N.T. 83:13-16; Doc. 52-1, p. 324, N.T. 83:13-16). The Commissioners then voted to terminate Plaintiff. (Doc. 44, ¶ 31; Doc. 51, ¶ 150).

On April 8, 2021, Plaintiff's employment with UCCD was terminated. (Doc. 44-3, p. 2; Doc. 52-1, p. 453). Plaintiff was informed via a letter signed by the three County Commissioners. (Doc. 44-3, p. 2; Doc. 52-1, p. 453). The letter states,

> This letter is to inform you that as of April 8, 2021, your employment with Union County Conservation District is terminated. You are being dismissed for cause, specifically, for insubordination.
>
> On March 30, 2021, you refused multiple times to meet with your immediate department director to discuss a work-related matter. Your continued refusal to meet with your immediate department director led to verbally assaulting him. When asked to leave the premises by your immediate department director, you refused to leave unless you were directed to leave by another authority (member of the Conservation District Board or Human Resources).

(Doc. 44-3, p. 2; Doc. 52-1, p. 453). At the time of his termination, Plaintiff was fifty-seven years old. (Doc. 44, ¶ 35; Doc. 50, ¶ 35).

In the summer of 2021, the County hired Jody Gibson to fill Plaintiff's former position. (Doc. 44, ¶ 36; Doc. 50, ¶ 36). Gibson was over forty years old, but younger than Plaintiff. (Doc. 44, ¶ 37; Doc. 50, ¶ 37).

### G.    PROCEDURAL HISTORY

On July 14, 2021, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC"), numbered 2021-00065. (Doc. 27, ¶ 10). On or around July 14, 2022, the PHRC mailed Plaintiff a right to sue letter. (Doc. 27, ¶ 11; Doc. 27-1, p. 2).

On October 5, 2021, Plaintiff Eric Ernst filed this action against Defendant Union County Conservation District ("UCCD"). (Doc. 1). The case was assigned to United States District Court Chief Judge Matthew W. Brann for the Middle District of Pennsylvania. On December 10, 2021, Defendant UCCD filed a motion to dismiss for failure to state a claim. (Doc. 9). On June 10, 2022, Judge Brann issued an Opinion and Order denying that motion. (Docs. 13, 14). On August 15, 2022, upon consent of Plaintiff and Defendant UCCD the case was assigned to the undersigned. (Doc. 21).

On August 12, 2022, Plaintiff filed a motion for leave to file an amended complaint. (Doc. 19). On August 23, 2022, the undersigned granted Plaintiff's

motion. (Doc. 24). On August 24, 2022, Plaintiff filed his amended complaint. (Doc.

27). Plaintiff's amended complaint added Defendant Union County.

Like the original complaint, Plaintiff's amended complaint asserts claims

under the Age Discrimination in Employment Act ("ADEA"), the Pennsylvania

Human Relations Act ("PHRA"), and the Pennsylvania Whistleblower Law

("PWBL"). (Doc. 27). To his amended complaint Plaintiff attaches a copy of the

PHRA right to sue letter, (Doc. 27-1, p. 2), and the letter informing him of his

termination, (Doc. 27-2, p. 2).

On September 6, 2022, Defendants filed a Motion to Dismiss, (Doc. 29),

which was granted in part and denied in part, (Doc. 42). On November 11, 2023,

Defendants filed an Answer to Plaintiff's Amended Complaint. (Doc. 48). On

November 2, 2023, Defendants filed a Motion for Summary Judgment, a Statement

of Facts, and a Brief in Support. (Docs. 43, 44, 45). On December 7, 2023, Plaintiff

filed a Brief in Opposition, Answer to Statement of Facts, Counterstatement of Facts,

and Appendix. (Docs. 59, 50, 51, 52). Defendants did not file a reply brief. The

motion is now ripe and ready for consideration.

## III.   LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court

shall grant summary judgment if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."[2] A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.[3] For a dispute to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."[4]

A party moving for summary judgment bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact."[5] "If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways."[6] First, the party moving for summary judgment "may submit affirmative evidence that negates an essential element of the nonmoving party's

---

[2] Fed. R. Civ. P. 56(a).

[3] *Haybarger v. Laurence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[4] *Id.* (quoting *Anderson,* 477 U.S. at 248-49).

[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[6] *Id.* at 331 (Brennan, J., dissenting); *see also Finley v. Pennsylvania Dep't. of Corrections*, No. 3:12-CV-2194, 2015 WL 1967262, at *9 n.1 (M.D. Pa. Apr. 30, 2015) (observing that the Third Circuit has found that Justice Brennan's dissent in *Celotex* "does not differ with the opinion of the Court regarding the appropriate standards for summary judgment) (citing *In re Bressman*, 327 F.3d 229, 337 n.3 (3d Cir. 2003) and *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 n.2 (3d Cir. 1987)).

claim."[7] Second, the party moving for summary judgment "may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."[8]

Once the party moving for summary judgment has met its burden, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."[9] To show that there is a genuine dispute of material fact, the non-moving party must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials."[10] If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial[,]" summary judgment is appropriate.[11] Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.[12]

---

[7] *Celotex*, 477 U.S. at 331 (Brennan J., dissenting).

[8] *Id.*

[9] *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *Celotex*, 477 U.S. at 324.

[10] Fed. R. Civ. P. 56(c)(1)(A).

[11] *Celotex*, 477 U.S. at 322.

[12] *Anderson*, 477 U.S. at 249.

Finally, when ruling on a motion for summary judgment, it is not the province of the court to weigh evidence or assess credibility. It must view the evidence presented and draw all inferences in the light most favorable to the non-moving party.[13] The court may not decide whether the evidence unquestionably favors one side or the other or make credibility determinations.[14] Instead, it must decide whether a fair-minded jury could return a verdict for the non-movant on the evidence presented.[15] The Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.[16]

In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[17]

---

[13] *Lawrence v. City of Phila., Pa.*, 527 F.3d 299, 310 (3d Cir. 2008) (citing *Davis v. Mountaire Farms Inc.*, 453 F.3d 554, 556 (3d Cir. 2006)).

[14] *Anderson*, 477 U.S. at 252.

[15] *Id.*

[16] *Big Apple BMW v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[17] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.    ANALYSIS

Defendants move for summary judgment on all three of Plaintiff's claims. We discuss Plaintiff's ADEA and PHRA claims together, followed by his claim under the PWBL.

### A.    PLAINTIFF'S ADEA AND PHRA CLAIMS

Plaintiff asserts claims under the ADEA and PHRA, alleging that "his age was a determining factor in Union County's decision to terminate his employment with UCCD" and that "Defendants' decision to terminate [Plaintiff's] employment was because of his age." (Doc. 27, ¶¶ 51, 57). At the time of his termination, Plaintiff was fifty-seven years old. (Doc. 27, ¶¶ 49, 57).

The ADEA provides in pertinent part that "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."[18] Similarly, the PHRA provides in relevant part that under Pennsylvania law, "[i]t shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification . . . [f]or any employer because of the . . . age. . . of any individual . . . to discharge from employment such individual."[19] The Third Circuit has noted that "the same legal

---

[18] 29 U.S.C. § 623(a)(1).
[19] 43 P.S. § 955(a).

standards and analysis are applicable to claims under both the ADEA and PHRA,"
and has addressed ADEA and PHRA claims collectively.[20] We will do the same
here.

Claims of discrimination under the ADEA or PHRA can be established in one
of two ways: through direct evidence or through circumstantial evidence.[21] "Direct
evidence of discrimination would be evidence which, if believed, would prove the
existence of the fact [in issue] *without inference or presumption.*"[22] "[E]vidence is
not direct where the trier of fact must *infer* the discrimination on the basis of age
from an employer's remarks."[23] In this case, Plaintiff appears to acknowledge that
he has not provided direct evidence of discrimination as he discusses the framework
used to evaluate discrimination claims based on circumstantial evidence. (Doc. 49,
pp. 10-25).

"Age discrimination claims in which the plaintiff relies on circumstantial
evidence proceed according to the three-part burden-shifting framework set forth in

---

[20] *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 509 n.2 (3d Cir. 2004)
(internal quotations omitted).
[21] *Gallagher v. Cent. Valley Sch. Dist.*, No. 22-CV-1791, 2024 WL 3969669,
at *4 (W.D. Pa. Aug. 28, 2024) (citing *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d
163, 167 (3d Cir. 2001)).
[22] *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) (quoting *Earley v.
Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)) (internal quotation
marks omitted) (emphasis in original).
[23] *Torre*, 42 F.3d at 829 (citing *Perry v. Prudential-Bache Securities, Inc.*, 738
F.Supp. 843, 851 (D.N.J. 1989), *aff'd without opinion*, 904 F.2d 696 (3d Cir.), *cert.
denied*, 498 U.S. 958 (1990)) (emphasis in original).

*McDonnell Douglas Corp. v. Green.*"[24] Under *McDonnell Douglas*, first, a plaintiff must first establish a *prima facie* case of discrimination.[25] Once the plaintiff has done so, the burden of production shifts to the employer "who must articulate a legitimate nondiscriminatory reason for the adverse employment action."[26] Finally, once the employer has satisfied this step, "the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual."[27] While the burden of production shifts under the *McDonnell Douglas* framework, the burden of persuasion always remains with the plaintiff.[28]

       i.    *Prima Facie Case*

Under *McDonnell Douglas*, to proceed on his discrimination claim Plaintiff must establish a *prima facie* case of age discrimination.[29]

> The elements of a *prima facie* case of age discrimination are that: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by

---

[24] *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[25] *Willis*, 808 F.3d at 644.

[26] *Id*. (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 412 (3d Cir. 1999)) (internal quotation marks omitted).

[27] *Willis*, 808 F.3d at 644 (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 426-27 (3d Cir. 2013)).

[28] *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009).

[29] *Willis*, 808 F.3d at 644.

another employee who was sufficiently younger so as to support an inference of a discriminatory motive.[30]

For the purposes of their summary judgment motion, Defendants have assumed, *arguendo*, that Plaintiff meets the elements to support a *prima facie* case under the ADEA and PHRA. (Doc. 45, p. 11). Accordingly, the Court will do the same and assume for the purposes of this Motion that Plaintiff has stated a *prima facie* case under the ADEA and PHRA.

### ii.    *Legitimate, Nondiscriminatory Reason*

Because we assume, *arguendo*, that Plaintiff has made out a *prima facie* case of age discrimination, the burden of production shifts to Defendants to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination.[31] This does not require Defendants "prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action."[32] However, Defendants "must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons."[33]

For the purposes of his opposition to Defendants' Motion for Summary Judgment, Plaintiff has assumed, *arguendo*, that Defendants articulated a legitimate,

---

[30] *Willis*, 808 F.3d at 644 (citing *Burton*, 707 F.3d at 426).
[31] *Willis*, 808 F.3d at 644.
[32] *Id*.
[33] *Id*. (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

nondiscriminatory reason for terminating Plaintiff. (Doc. 49, p. 13).[34] Thus, the Court will again do the same and assume for the purposes of this Motion that Defendants have articulated a legitimate, nondiscriminatory reason for terminating Plaintiff.

### iii.    Pretext

Given that we assume, *arguendo*, that Defendants have articulated a legitimate, nondiscriminatory reason for terminating Plaintiff, the burden of production shifts back to Plaintiff "to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual."[35] The Third Circuit has recognized two ways a plaintiff can demonstrate pretext to survive summary judgment.[36]

First, a Plaintiff can show pretext by "point[ing] to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action."[37] Raising sufficient disbelief requires a Plaintiff to point to evidence that "indicate[s] such weaknesses, implausibilities, inconsistencies, incoherencies, or

---

[34] Plaintiff acknowledges that "Defendants point to the March 30, 2021 incident between Ernst and Nyerges as a legitimate, non-discriminatory reason for Ernst's termination." (Doc. 49, p. 13).

[35] *Willis*, 808 F.3d at 644 (citing *Burton*, 707 F.3d at 426-27).

[36] *Willis*, 808 F.3d at 644-45 (citing *Fuentes*, 32 F.3d at 762).

[37] *Willis*, 808 F.3d at 644 (citing *Fuentes*, 32 F.3d at 765).

contradictions in the employer's proffered legitimate reasons to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons."[38]

Second, a Plaintiff can show pretext by "point[ing] to evidence that would allow a factfinder to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[39] "Pointing to evidence demonstrating any of the following satisfies this second way to prove pretext: (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably."[40]

---

[38] *Willis*, 808 F.3d at 644-45 (quoting *Fuentes*, 32 F.3d at 765) (internal quotation marks omitted).

[39] *Willis*, 808 F.3d at 645 (quoting *Fuentes*, 32 F.3d at 764) (internal quotation marks omitted).

[40] *Willis*, 808 F.3d at 645 (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998) (citing *Fuentes*, 32 F.3d at 765)).

Additionally, the Third Circuit has applied the cat's paw[41] – or subordinate bias – theory of liability at the pretext step of *McDonnell Douglas*.[42] And, "[t]he Third Circuit ha[s] previously embraced the 'cat's paw' theory in the context of an ADEA claim."[43] "Under a cat's paw claim, a plaintiff may demonstrate discrimination by offering evidence that those exhibiting discriminatory animus influenced or participated in the decision to terminate [him]."[44] "The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision."[45]

---

[41] The term "cat's paw derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011). The fable tells the story of a cunning monkey who induces a naïve cat to retrieve chestnuts from a fire. Once the cat has done so, burning its paws in the process, the monkey runs off with the chestnuts, leaving the cat with nothing. "A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward." *Staub*, 562 U.S. at 415 n.1.

[42] *Afrasiabipour v. Pennsylvania Dep't of Transp.*, 469 F.Supp.3d 372, 386-87 (E.D. Pa. 2020) (quoting *Greenawalt v. Clarion Cnty.*, 459 F.App'x 165, 169 (3d Cir. 2012)) (footnote omitted).

[43] *Patel v. Shinseki*, 984 F.Supp.2d 461, 476 (W.D. Pa. 2013) (citing *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265 (3d Cir. 2001) (citing *Abrams v. Lightolier Inc.*, 50 F.3d 1204 (3d Cir. 1995))). *See also*, *Greenawalt*, 459 F. App'x at 169; *Mango v. United States Dep't of Veterans Affs.*, No. 1:19-CV-00708, 2021 WL 12313251, at *23 (M.D. Pa. Dec. 13, 2021), *report and recommendation adopted*, No. 1:19-CV-00708, 2022 WL 22887643 (M.D. Pa. Jan. 25, 2022); *Howell v. Raymours Furniture Co.*, 26 F.Supp.3d 366, 372 (M.D. Pa. 2014); *Socoloski v. Sears Holding Corp.*, No. 11-3508, 2012 WL 3155523, at *6 (E.D. Pa. Aug. 3, 2012)

[44] *Howell*, 26 F.Supp.3d at 372.

[45] *Staub*, 562 U.S. at 421.

Courts in this Circuit have noted that,

There is a doctrinal tension with [the] use of the cat's paw theory under the *McDonnell Douglas* framework because "the cat's paw theory originated in the context of mixed-motive discrimination claims," *Kowalski v. Postmaster Gen. of United States*, 811 Fed.Appx. 733, 739 (3d Cir. 2020), "not claims pursued through the *McDonnell Douglas* burden-shifting framework," because "the [cat's paw] theory is premised on a biased subordinate." *Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1152 (8th Cir. 2011) (noting the "uneasy marriage between the *McDonnell Douglas* framework and a cat's paw theory of employer liability"); *see also Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 427 (6th Cir. 2014) (declining to consider "whether and to what extent cat's paw liability fits into the [*McDonnell Douglas*] framework). Despite this tension, the Third Circuit and several other Courts of Appeals have applied the cat's paw theory of liability in the pretext step of the *McDonnell Douglas* framework. *See, e.g.*, *Durst v. City of Phila.*, 798 F. App'x 710, 714 (3d Cir. 2020) (applying cat's paw theory during pretext step of *McDonnell Douglas* framework); *Neidigh v. Select Specialty Hosp.-McKeesport*, 664 F. App'x 217, 222 (3d Cir. 2016) (same); *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 70 (1st Cir. 2015) (same); *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (same); *but see DeNoma v. Hamilton Cnty. Court of Common Pleas*, 626 F. App'x 101, 105 (6th Cir. 2015) (analyzing *McDonnell Douglas* steps and cat's paw elements separately).[46]

Accordingly, "[t]his Court follows Third Circuit precedent and analyzes plaintiff's cat's paw argument in the pretext step of the *McDonnell Douglas* framework.

To survive summary judgment based on a cat's paw theory of liability, a plaintiff must establish (1) a genuine issue of material fact concerning the bias of the subordinate, and (2) a genuine issue of material fact "as to whether the proffered reason for the employment action is pretextual, which in a [cat's paw] claim requires the plaintiff to demonstrate a

---

[46] *Afrasiabipour*, 469 F.Supp.3d at 386-87 (footnote omitted) (alternations in original). *See also*, *Mango*, 2021 WL 12313251, at *21 n.38.

causal relationship between the subordinate's actions and the
employment decision." *Mason* [*v. Se. Pa. Transp. Auth.*], 134 F. Supp.
3d [868,] 874 [(E.D. Pa. 2015)] (quoting *E.E.O.C. v. BCI Coca-Cola
Bottling Co. of Los Angeles*, 450 F.3d 476, 488 (10th Cir. 2006)).[47]

"To establish a causal relationship between the actions of a subordinate and the

employment decision, a plaintiff must show proximate cause–some direct relation

between the injury asserted and the injurious conduct alleged and [excluding] links

that are remote, purely contingent, or indirect."[48] "It is causation substantial enough

and close enough to the harm to be recognized by law."[49]

Defendants argue that Plaintiff cannot come forward with evidence of pretext.

Defendants cite to the testimony of Plaintiff and his former coworkers that offer

differing accounts of comments Nyerges made relating to Plaintiff retiring. (Doc.

45, pp. 14-15). They argue that even when construing the alleged statements by

Nyerges in favor of Plaintiff, he does not put forth any evidence showing the context

of the statements, when the statements were made, or that the statements played a

role in the decision to terminate Plaintiff. (Doc. 45, p. 15). Looking at the statements

together, Defendants argue "no evidence suggests a nexus between the alleged

---

[47] *Afrasiabipour*, 469 F.Supp.3d at 387 (footnote omitted). *See also Gallagher*, 2024 WL 3969669 at *7.

[48] *Gallagher*, 2024 WL 3969669 at *7 (quoting *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015) (citing *Staub*, 562 U.S. at 419) (internal quotation marks omitted).

[49] *McKenna v. City of Phila.*, 649 F.3d 171, 178 (3d Cir. 2011) (quoting *Sosa v. Alvarez–Machain,* 542 U.S. 692, 704 (2004)) (internal quotation marks omitted).

comments by Nyerges and the decision to terminate Plaintiff." *Id*. Defendants cite to Plaintiff's testimony admitting that during the March 30, 2021 incident, there was no mention of age or retirement by Nyerges or Plaintiff. *Id*. Defendants argue that, furthermore, management of UCCD personnel is within the purview of the County, specifically the County Commissioners and the Chief Clerk for the County. (Doc. 45, p. 16).[50] Therefore, Nyerges did not have the authority to terminate Plaintiff, and the ultimate decision to terminate Plaintiff was made by the County Commissioners. *Id*. "To that end," Defendants argue, "Plaintiff is unable to point to any evidence that the County Commissioners considered Plaintiff's age as a factor in their decision to terminate Plaintiff's employment," and Defendants are therefore entitled to summary judgment." *Id*.

Plaintiff responds in his Brief in Opposition by asserting the cat's paw theory. (Doc. 49, pp. 14-25). Plaintiff argues that "Nyerges's repeated discriminatory comments about Ernst's age and need to retire, and proximately causing his termination, is sufficient under the Cat's Paw theory for Ernst's age discrimination claim to survive summary judgment." (Doc. 49, p. 25). As to Nyerges's discriminatory animus, Plaintiff asserts that Nyerges repeatedly made comments in relation to Plaintiff about retirement, citing to his own testimony and the testimony of his former co-workers. (Doc. 49, p. 16). Plaintiff asserts that "Defendants cannot

---

[50] Citing to Doc. 44-4, p. 3.

plausibly argue that Nyerges's repeated age-related statements are not evidence of discriminatory animus." (Doc. 49, p. 24). As to proximate cause, Plaintiff argues that Nyerges proximately caused his termination when Nyerges provoked the March 30, 2021 altercation and omitted his own role in the altercation in his statements. (Doc. 49, pp. 23-25). Defendants filed no reply brief and therefore have not directly addressed Plaintiff's cat's paw theory arguments.

### a.  Discriminatory Animus

To survive summary judgment on a cat's paw theory, Plaintiff must establish a genuine dispute of material fact regarding Nyerges's discriminatory animus.[51] Here, Plaintiff has done so. Although Defendants did not reply to Plaintiff's cat's paw arguments, they argue in their Brief in Support that, while Plaintiff testified to alleged comments about retirement that Nyerges made, Plaintiff was unable to recall certain details such as when the comments were made, or recall who the customer Nyerges introduced Plaintiff to by stating Plaintiff would be retiring soon, and that Plaintiff acknowledged he was unsure if the County and UCCD Board Members heard he was retiring from Nyerges. (Doc. 45, p. 14; Doc. 45-4, p. 22, N.T. 81:1-83:20). Defendants also point to "[f]ormer co-workers of Plaintiff testif[ying] of differing accounts regarding the alleged statements by Nyerges." (Doc. 45, p. 14).

---

[51] *Afrasiabipour*, 469 F.Supp.3d at 387-88; *Gallagher*, 2024 WL 3969669, at *7.

Defendants specifically point to testimony from Moyer saying she did not recall Nyerges commenting on Plaintiff's age or saying he needed to retire, testimony from coworker Sharon Burkland-Stamm ("Stamm") that, while she heard statements from Nyerges about Plaintiff's retirement, she could not recall any exact words by Nyerges stating he wants or wishes Plaintiff to retire, and testimony from coworker Gregory Bonsall that as far back as 2005 Plaintiff was speaking about his five-year retirement plan and would mention speaking with financial advisors. (Doc. 45, pp. 14-15; Doc. 45-11, p. 19, N.T. 18:12-20; Doc. 45-10, p. 112, N.T. 111:13-15; Doc. 45-12, pp. 94-95, N.T. 93:10-94:9).

In response, Plaintiff proffers testimony from himself, Bonsall, and Stamm. (Doc. 49, pp. 15-17). Plaintiff cites to his testimony where he stated that former coworker Randy Ross told him that Nyerges told Ross that Plaintiff should or needed to retire. (Doc. 49, p. 16; Doc. 51, ¶ 45; Doc 52-1, p. 21, N.T. 39:1-12). Plaintiff also points to his testimony that Nyerges introduced him to a customer from a solar panel farm company, stating that Plaintiff was going to be retiring soon, when Plaintiff had no plans to retire. (Doc. 49, p. 16; Doc. 51, ¶ 44; Doc. 52-1, pp. 46-47, N.T. 82:18-83:4). Plaintiff also testified that Nyerges would ask Plaintiff if he was going to retire and when he was going to retire during the two years the two worked together, though Plaintiff could not recall whether comments were made to him in 2021. (Doc. 45-4, p. 22, N.T. 82:2-10).

Plaintiff also cites to Stamm's testimony where she states that, while she could not recall specific sentences, Nyerges's comments were "when and I wish he -- like it was more along the lines of I wish he would." (Doc. 49, p. 16; Doc. 51, ¶ 43; Doc. 45-10, p. 112, N.T. 111:9-12). Stamm testified that she thought she could recall Nyerges stating Plaintiff should retire or that Nyerges wanted him to retire:

> Q   Now, the comments by Mr. Nyerges you said when Mr. Ernst retires; is that right?
>
> A   When and I wish he -- like it was more along the lines of I wish he would.
>
> Q   When you said it's along the lines of, did he say specifically that I wish Mr. Ernst would retire?
>
> A   I can't recall that. I don't know.
>
> Q   Do you recall any time where he said specifically that Mr. Ernst should retire or that I want him to retire?
>
> A   I feel like, yes. . . .

(Doc. 49, p. 16; Doc. 51, ¶ 43; Doc. 45-10, p. 112, N.T. 111:9-19).

The record reveals that Stamm also testified that Nyerges "frequent[ly] enough" made statements about wishing Plaintiff would retire or what they would do when Plaintiff retires:

> Q   Okay. How would you explain Mr. Nyerges's treatment of Mr. Ernst in the workplace?
>
> A    . . . . But I feel like he was always like oh, I wish Eric would retire or when he retires. When he retires, then we'll do this.

Q    How often would he make statements like that?

A    Seemed frequent enough because it was kind of bothersome to me because Eric had a lot of experience, Ernst had a lot of experience and knowledge and time there. . . .

. . . .

Q    Do you know who Mr. Nyerges would be speaking to when he'd make these statements?

A    Sometimes it was when he and I were out on site visits together and so we'd just be in the vehicle. There was a lot of vehicle time spent chatting.

(Doc. 45-10, pp. 22-23, N.T. 21:23-22:24). Stamm testified that Nyerges's retirement statements were targeted towards Plaintiff and that Nyerges made these statements over the course of the two and a half years prior to Plaintiff's termination. (Doc. 45-10, pp. 42-43, N.T. 41:12-15, 42:6-10). Stamm also testified that she thought Nyerges knew her and Plaintiff "were close enough" that if Nyerges made comments about Plaintiff's retirement, Stamm would tell Plaintiff. (Doc. 45-10, pp. 24-25, N.T. 23:22-24). When asked if she would like to explain her perception of Nyerges's age-related statements, Stamm responded, "[y]eah. I mean just the general statements that he was making. I can't recall the exact language, but it was -- made me feel uncomfortable thinking that he was trying to push us out . . . . And my perception was he was trying to get rid of Eric or us." (Doc. 45-10, p. 117, N.T. 116:7-12, 20-21). Stamm testified that Nyerges treated Jody Gibson more favorably

than Plaintiff, stating that Nyerges "was not aggressive with Jody." (Doc. 45-10, p. 56, N.T. 55:5-8).

Plaintiff cites to Bonsall's testimony where he states that Plaintiff never expressed a present intention to retire in 2020. (Doc. 49, p. 16; Doc. 51, ¶ 48). He also cites to Bonsall's testimony that Nyerges described Plaintiff "as on ROAD," which Nyerges then explained meant "retired on active duty." (Doc. 49, p. 16; Doc. 51, ¶ 42; Doc. 52-1, pp. 256-57, N.T. 92:19-93:3). Bonsall further testified when asked if he had heard Nyerges make other statements about Plaintiff retiring that, "I remember at some function -- somewhere along the lines something must have been said because the district chairman said something to Eric Ernst about, I hear you're retiring soon," and Plaintiff was "shocked." (Doc. 49, p. 16; Doc. 51, ¶ 47; Doc. 52-1, pp. 259-260, N.T. 95:21-96:5).

The record also reveals that, when asked whether Nyerges was saying Plaintiff should retire when he called Plaintiff "on ROAD," Bonsall responded,

> I guess he was implying that, yeah. I mean, he was implying that he was there doing what he needed to do, but yet riding it out. You know how -- we got -- we all know those people on the five year plan or whatever. I think that's what Mr. Nyerges was referring to.

(Doc. 52-1, p. 257, N.T. 93:7-13). Further, Bonsall testified about his decision to leave his position with UCCD:

Q    Why did you leave?

A      Well, it was simple. It was either leave on my behalf or get
       booted out.

Q      And why would you be booted out?

A      I think it was made pretty clear by Mr. Nyerges that he would --
       he'd like to get rid of the old and get new. . . .

(Doc. 45-12, p. 59, N.T. 58:14-20).

In this case, the evidence Plaintiff cites to, and additional evidence of record, if believed, provide a basis from which a reasonable juror could infer that Nyerges harbored discriminatory animus toward Plaintiff based on his age. Defendants' focus on Plaintiff and Stamm's inability to recall certain specific details seems to verge on inviting the Court to find that their inability to recall these details makes their testimony unreliable. (Doc. 45, pp. 14-15). However, "[s]uch questions of credibility are precisely the sort of issues courts are precluded from making in considering motions for summary judgment."[52] Moreover, Defendants acknowledge that there are "differing accounts" about age-related statements Nyerges allegedly made. (Doc. 45, p. 14). Again, at summary judgment, this Court cannot make a credibility determination and decide which of the differing accounts is more believable or reliable. Defendants provide no argument as to how the "differing accounts" and the additional evidence cited by Plaintiff and in the record are insufficient to create a genuine dispute of material fact about Nyerges's discriminatory animus. For these

---

[52] *Howell*, 26 F.Supp.3d at 373.

reasons, we find that Plaintiff has established a genuine dispute of material fact regarding Nyerges's discriminatory animus.[53]

      *b.   Proximate Cause*

Plaintiff must also establish "a genuine issue of material fact as to whether the proffered reason for the employment action is pretextual, which in a [cat's paw] claim requires the plaintiff to demonstrate a causal relationship between the subordinate's actions and the employment decision" in order to survive summary judgment.[54] In their Brief in Support, Defendants argue that while Nyerges was the manager of UCCD at the time of Plaintiff's termination, he did not have the authority to terminate Plaintiff. (Doc. 45, p. 16). Defendants assert that pursuant to County policy, the County Commissioners made the ultimate determination to terminate Plaintiff, and Plaintiff cannot point to any evidence that the County Commissioners considered Plaintiff's age as a factor in their decision to terminate him. *Id*. However, Plaintiff's use of the cat's paw theory makes this argument misplaced, and Defendants filed no reply brief addressing Plaintiff's cat's paw arguments.

---

[53] *Afrasiabipour*, 469 F.Supp.3d at 387-88; *Gallagher*, 2024 WL 3969669 at *7.

[54] *Afrasiabipour*, 469 F.Supp.3d at 387 (quoting *Mason v. Se. Pa. Transp. Auth.*], 134 F.Supp.3d 868, 874 (E.D. Pa. 2015) (internal quotation marks omitted).

Plaintiff concedes that the Commissioners had the authority to make termination decisions.[55] (Doc. 50, ¶ 30). Plaintiff argues that, despite this, Nyerges influenced the Commissioners decision to terminate him and was the proximate cause of his termination. (Doc. 49, pp. 15, 24-25). Plaintiff argues that "Nyerges proximately caused Ernst's termination by provoking an altercation and then omitting his role in it when reporting to the Commissioners." (Doc. 49, pp. 24-25).

Again, "[t]o establish a causal relationship between the actions of a subordinate and the employment decision, a plaintiff must show proximate cause–some direct relation between the injury asserted and the injurious conduct alleged [excluding] links that are remote, purely contingent, or indirect."[56] Here, the record could support a finding that Nyerges's alleged discriminatory animus translated into actions proximately causing the Commissioners to terminate Plaintiff when Nyerges allegedly provoked the altercation and omitted his role in his statements about the altercation.

As to Nyerges's alleged provocation of the altercation, the record reflects that Plaintiff wrote in his statement that Nyerges was "combative and antagonistic" and

---

[55] Plaintiff clarifies, however, that "pursuant to the County's Progressive Discipline Policy, terminations decisions should be made after the Department Head, such as Nyerges, proves just cause at an Executive Session before the Commissioners." (Doc. 50, ¶ 30).

[56] *Gallagher*, 2024 WL 3969669, at *7 (quoting *Jones*, 796 F.3d at 330 (citing *Staub*, 562 U.S. at 419) (internal quotation marks omitted).

that if Nyerges had not been "harassing and antagonizing [Plaintiff], [he] would not have sworn." (Doc. 52-1, p. 344). Moyer wrote in her statement that Nyerges was following Plaintiff around the office and testified that Nyerges followed Plaintiff around the office and that Plaintiff told Nyerges to leave him alone. (Doc. 45-11, p. 30, N.T. 29:4-7, 12-18; Doc. 52-1, p. 344). Moyer testified that Plaintiff tried to walk away from the situation, but that Nyerges followed him back to his office and blocked Plaintiff's door. (Doc. 45-11, p. 32, N.T. 31:14-19). Moyer also wrote in her statement that Nyerges was "provoking" Plaintiff by "blocking" Plaintiff's ability to leave his office. (Doc. 52-1, p. 350). Moyer testified that it seemed like Nyerges was antagonizing Plaintiff when he told Plaintiff to hit him, and that she perceived that statement as a threat, but did not perceive Plaintiff's response to be. (Doc. 45-11, pp. 33-34, N.T. 32:23-33:20). Moyer further testified about Plaintiff and Nyerges's behavior during the event, describing Plaintiff as "upset [and] provoked, but pretty much just, I was surprised, stood there, you know," and that it was Nyerges who behaved aggressively. (Doc. 45-11, pp. 34-35, N.T. 33:21-34:7).

Nyerges testified that he did follow Plaintiff around the office but did not remember Plaintiff ever asking him to stop and denied blocking Plaintiff. (Doc. 45-5, pp. 16, 20, N.T. 60:19-21, 74: 6-15). Nyerges testified that he remembered saying "go ahead and push me and see what happens" to Plaintiff because he was "hoping" Plaintiff would physically hit him "because it would be easier to resolve the issue."

(Doc. 45-5, p. 21, N.T. 80:3-9). Nyerges's written statement characterized Plaintiff as becoming more "animated and belligerent" as the two spoke. (Doc. 44-8, p. 12; Doc. 52-1, p. 347).

To demonstrate Nyerges's omitting his role in the altercation, Plaintiff points to the inconsistencies between Nyerges's written statement and Ernst, Moyer, Cullen and Ross's statements. (Doc. 49, p. 24; Doc. 51, ¶ 141). For example, Nyerges does not discuss blocking Plaintiff from leaving his office, Nyerges making the push statement to Plaintiff, or that Nyerges said he would call the police. (Doc. 45-7, pp. 67-74, N.T. 66:2-73:6; Doc. 45-11, pp. 43-44, N.T. 42:16-43:6; Doc. 52-1, pp. 344-353). Plaintiff also highlights the fact that nobody investigated the inconsistencies in Nyerges's report or followed up with any of the individuals who provided statements. (Doc. 49, p. 24; Doc. 51, ¶ 142). Showers testified that she and Greene did not discuss the discrepancies between the statements, and that at no point in the investigation did Showers speak to anyone to resolve the discrepancies. (Doc. 45-7, pp. 74-75, N.T. 73:7-14, 74:14-19). Showers also testified that she does not remember discussing the inconsistencies with the Commissioners. (Doc. 45-7, p. 75, N.T. 74:7-9). Boop also testified that he was not told about the inconsistencies between Nyerges's statement and the other witness statements prior to the decision to terminate Plaintiff. (Doc. 45-9, p. 97, N.T. 96:20-23).

Further, Boop testified that the March 30th Zoom meeting during which Nyerges spoke with the Commissioners about the incident earlier that day was an executive session. (Doc. 45-9, p. 108, N.T. 107:6-11). Boop testified that during that executive session, Nyerges proved just cause existed to terminate Plaintiff. (Doc. 45-9, p. 109, N.T. 108:6-9; Doc. 52-1, p. 364).

Plaintiff has shown "that a reasonable factfinder could find the required causation in that evidence could support the conclusion that there was 'some direct relation' between" Nyerges's alleged provocation of the altercation and alleged omission of his role in the altercation, and the Commissioners' decision to terminate Plaintiff.[57] Plaintiff and Moyer's testimony that Nyerges deliberately provoked the altercation that was the basis for Plaintiff's termination, if credited, could suggest that Nyerges has a direct relation to Plaintiff's termination by deliberately causing the event Plaintiff's termination was based on. Moreover, Boop's testimony that Nyerges proved just cause to terminate Plaintiff, if believed, implies that Nyerges, through his statements to the Commissioners omitting his role in the altercation, had a direct relation to Plaintiff's termination by providing the just cause the Commissioners relied on to terminate Plaintiff. (Doc. 45-9, p. 109, N.T. 108:6-9; Doc. 52-1, p. 364).

---

[57] *Chase v. Frontier Commc'ns Corp.*, 361 F.Supp.3d 423, 450 (M.D. Pa. 2019) (quoting *Jones*, 796 F.3d at 330-31).

Accordingly, because Plaintiff has established genuine issues of material fact concerning Nyerges's discriminatory animus, and the causal relationship between Nyerges's actions and Plaintiff's termination, Plaintiff's ADEA and PHRA claims survive summary judgment.[58]

### B.    PLAINTIFF'S PWBL CLAIM

Plaintiff asserts a claim under the PWBL, alleging Nyerges's behavior toward Plaintiff on March 30, 2021 was "reprisal" from Plaintiff's reports about improperly processed NPDES permits. (Doc. 27, ¶¶ 59-79). Plaintiff alleges that Defendants' retaliation against him for making good faith reports of the improper processing of NPDES permits violated the PWBL. (Doc. 27, ¶ 77).

The PWBL provides in relevant part:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.[59]

Under the PWBL, a good faith report is: "a report of conduct defined in this act as wrongdoing or waste which is made without malice or consideration of personal

---

[58] *Afrasiabipour*, 469 F.Supp.3d at 387. *See also*, *Gallagher*, 2024 WL 3969669, at *7.

[59] 43 Pa. C.S. § 1423(a).

benefit and which the person making the report has reasonable cause to believe is true.[60] The PWBL defines wrongdoing as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."[61]

Courts use a burden-shifting framework to evaluate PWBL claims.[62] First, a plaintiff must establish a *prima facie* case under the PWBL. "To establish a prima facie case under the law, the employee must: (1) make a good faith report of wrongdoing to the employer or an appropriate authority; (2) experience an adverse action by the employer; and (3) show that the adverse action was due to the report."[63] Once a *prima facie* case is established, "the burden shifts to the employer to prove that it would have taken the same adverse employment action absent the employee's good-faith report of wrongdoing."[64] "The burden shifts to the defendant to show a

---

[60] 43 P.S. § 1422.

[61] *Id.*

[62] *Brennan v. City of Phila.*, No. 18-1417, 2020 WL 3574454, at *12 (E.D. Pa. June 30, 2020), *aff'd*, 856 F. App'x 385 (3d Cir. 2021).

[63] *Jacobs v. City of Philadelphia*, No. 19-4616, 2022 WL 11804030, at *3 (E.D. Pa. Oct. 20, 2022), *appeal dismissed*, No. 22-3181, 2023 WL 3529414 (3d Cir. Feb. 14, 2023) (citing *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1200 (Pa. 2001)).

[64] *Jacobs*, 2022 WL 11804030, at *3 (quoting *O'Rourke*, 778 A.2d at 1204) (internal quotation marks omitted).

separate and legitimate reason for [the] actions only where plaintiff has satisfied the

threshold showing of a causal connection."[65]

"The connection between the report of wrongdoing and the alleged retaliatory

acts must be demonstrated by concrete facts or surrounding circumstances."[66]

> Under the PWL, evidence of causation includes (1) "specific direction
> or information ... not to file the report or that there would be adverse
> consequences because the report was filed," *Evans v. Thomas Jefferson
> Univ.*, 81 A.3d 1062, 1070 (Pa. Commw. Ct. 2013) (internal citation
> and quotation marks omitted); (2) "temporal proximity between the
> protected activity and the alleged discrimination," *McAndrew v. Bucks
> Cnty. Bd. of Comm'rs*, 982 F. Supp. 2d 491, 505 (E.D. Pa. 2013)
> (internal citation and quotation marks omitted); and (3) "the existence
> of a pattern of antagonism in the intervening period," *id.* In the absence
> of that proof, courts may evaluate the record as a whole to determine
> whether retaliatory animus can be inferred. *Way v. Aspira Inc.*, No. 17-
> 0579, 2018 WL 1399525, at *4 (E.D. Pa. Mar. 20, 2018). " '[V]ague
> and inconclusive circumstantial evidence' is insufficient to satisfy that
> threshold burden to show a causal connection and shift the burden to
> the defendant to justify its actions." *Evans*, 81 A.3d at 1070 (quoting
> *Golaschevsky*, 720 A.2d at 759–60).[67]

Defendants argue that Plaintiff fails to plead a legal basis for a PWBL claim

because he fails to allege and identify with particularity any state or federal statute

or regulation violated, did not make any "report," and fails to show any evidence of

a causal connection between the alleged reports and the alleged act of retaliation.

---

[65] *Evans v. Thomas Jefferson Univ.*, 81 A.3d 1062, 1070 (Pa. Commw. Ct. 2013) (citing *O'Rourke*, 778 A.2d at 1200)

[66] *Shearn v. W. Chester Univ. of Pennsylvania*, No. 14-3706, 2017 WL 1397236, at *6 (E.D. Pa. Apr. 19, 2017) (quoting *Evans*, 81 A.3d at 1070) (internal quotation marks omitted).

[67] *Brennan*, 2020 WL 3574454, at *12.

(Doc. 45, pp. 19-24). Specifically as to causation, Defendants argue that Plaintiff makes only a general assertion that Nyerges was aware he spoke to a UCCD Board Member and County Commissioner and fails to provide proof indicating that Nyerges did know about those conversations. (Doc. 45, p. 24). Defendants point out that Plaintiff concedes neither he nor Nyerges referenced NPDES permits or Plaintiff's alleged report during the March 30, 2021 incident. *Id*. Defendants again emphasize that Nyerges did not have the authority to terminate Plaintiff, and that there is no evidence in the record that the County Commissioners considered the alleged reports in their decision to terminate Plaintiff. *Id*.

Plaintiff responds that he reported the NPDES permit issues to Nyerges on March 11, 2021, and "[a] few weeks later," the March 30, 2021 incident took place, resulting in Nyerges providing a biased statement to the Commissioners. (Doc. 49, p. 30). Plaintiff testified that he believed Nyerges was aware he had reported the issues with the permits to higher-ups at the time of the altercation, however he was not sure how Nyerges was made aware. (Doc. 49, p. 29; Doc. 51, ¶ 133; Doc. 45-4, p. 32, N.T. 123:6-12). Plaintiff argues that "[t]he PWBL provides that any individual with supervisory authority over the complainant may be held liable for that employee's wrongful termination." (Doc. 49, p. 26). Plaintiff relies on temporal proximity and a pattern of antagonism to show causation, arguing that "considering the temporal proximity between Ernst's good faith reports of wrongdoing and his

termination, alongside Nyerges's repeated pattern of antagonism, Ernst can establish a causal connection." (Doc. 49, p. 30).

While Plaintiff asserts that the temporal proximity coupled with Nyerges's "repeated pattern of antagonism" allows him to establish a causal connection, Plaintiff cites to no evidence in the record demonstrating a pattern of antagonism related to his alleged reports about the improperly processed permits. Other than Nyerges allegedly providing a biased statement to the Commissioners and threatening to quit if Ernst was not terminated following the March 30, 2021 altercation, Plaintiff does not identify any additional specific actions or inactions by Nyerges that demonstrate a pattern of antagonism that began after Plaintiff's alleged reports.[68] Nor can the Court identify any conduct by Nyerges demonstrating a pattern of antagonism after Plaintiff's alleged reports in our independent review of the record. The record contains little information on Nyerges's actions from March 11 to March 30, 2021.  Plaintiff has not established by concrete facts or surrounding circumstances that his termination was causally connected to his reports.[69]

---

[68] Conduct by Nyerges prior to Plaintiff's alleged reports does not evince a pattern of antagonism related to or in response to those alleged reports.

[69] The temporal proximity in this case is insufficient, by itself, to demonstrate a causal connection. Plaintiff writes that, "[h]ere, Ernst notified Nyerges of the improper NPDES permit issues on or around March 11th. A few weeks later, the March 30th incident occurred which resulted in Nyerges providing a biased statement to the Commissioners with the threat that either Ernst be terminated or he would leave." (Doc. 49, pp. 29-30). "The Third Circuit has noted that a temporal proximity greater than ten days [ ] requires supplementary evidence of retaliatory

Accordingly, because Plaintiff has failed to make a sufficient showing on this required element of his PWBL claim, Defendants' Motion for Summary Judgment on Plaintiff's PWBL claim will be granted.

## V.    CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment, (Doc. 43), will be GRANTED in part and DENIED in part as follows:

(1)    Defendants' Motion for Summary Judgment on Plaintiff's ADEA and PHRA claims will be DENIED;

(2)    Defendants' Motion for Summary Judgment on Plaintiff's PWBL claim will be GRANTED.

An appropriate order will issue.

Date: December 27, 2024                 BY THE COURT

_s/William I. Arbuckle_
William I. Arbuckle
U.S. Magistrate Judge

---

motive," and nineteen days passed between March 11 and March 30. _Woodard v. Scranton Quincy Hosp. Co., LLC_, No. 3:18-CV-140, 2018 WL 6018902, at *4 (M.D. Pa. Nov. 16, 2018). Nor does the record as a whole allow the Court to infer retaliatory motive. Other than the March 11, 2021 conversation between Nyerges and Plaintiff, and the March 30, 2021 altercation, the record is quiet as to any other specific conduct by Nyerges that happened after Plaintiff made his reports on March 11, 2021.